Lincoln Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

CHRIS ROY
ROY LAW
1000 SOUTHWEST BROADWAY
SUITE 900
PORTLAND OR 97205

EXHIBIT

2

Lincoln Financial Group®

Lincoln Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5853

January 9, 2020

Chris Roy
Roy Law
1000 SOUTHWEST BROADWAY
SUITE 900
PORTLAND, OR 97205

RE: Long Term Disability (LTD) Benefits
Astec Industries, Inc.
Claim #: 7224525
Claimant: Michael Cummins

Dear Mr. Roy:

We reviewed your appeal request for Long Term Disability ("LTD") benefits and maintained the decision to deny benefits for Mr. Cummins beyond April 7, 2019.

**Initial Claim Decision**

Mr. Cummins submitted a claim for his absence from work as of October 8, 2016, as a result of an injury to his right knee at work while going up and down the stairs. His LTD benefits began on April 8, 2017, therefore the change in definition of disability occurred on April 8, 2019 and to receive benefits beyond 24 months he must be disabled from any occupation as defined in the Policy. Benefits beyond April 7, 2019 were denied as the evaluation concluded he was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated February 28, 2019. Mr. Cummins was provided an opportunity to request an appeal review of the denial, stating the reasons why he felt that his claim should not have been denied, and submit additional information to support his claim. Specifically, you and he were advised to submit the following information:

*Office notes, test results, therapy notes, operative reports, treatment plans, hospital records, from all treating providers that supports Mr. Cummins' inability to perform any occupation as defined in the Astec Industries, Inc LTD Policy.*

*You should also provide any additional information that you feel will support his claim.*

**Appeal**

In your letter of appeal dated August 27, 2019, you indicated you were appealing, had submitted

information on a disc containing over 500 pages of medical records, and you were waiting for additional medical records. You requested we toll the appeal timeframe until those records were received.

In support of the claim, you submitted the following information:

- Over 500 pages of medical records, received on September 4, 2019
- On September 10, 2019, we also received medical records (7 pages ) from Oregon Medical Group – Orthopedics. You stated at this time the appeal review was complete.
- However, on September 20, 2019 we received a September 10, 2019 office visit note with C. Scott.

In the appeal, you stated Mr. Cummins suffered an on-the-job injury resulting in a right knee sprain and complex tear of his right medial meniscus, and the continuing effects of this condition, combined with severe osteoarthritis of the same knee, render him disabled from the reasonable performance of any full-time occupation. You stated Mr. Cummins' treating orthopedist recently recommended a full knee replacement; you also noted Mr. Cummins suffers from a daunting combination of conditions and resultant symptoms, all of which must be considered, he has been prescribed numerous medications to treat his chronic pain and other symptoms, the effects of which further diminish his physical and cognitive capacities. You stated Mr. Cummins is only able to stand in spurts of five minutes or less, and sit for roughly 30 minute increments, since the pain of sitting in one position leads to stiffness in his knee and a tightness in his lower back. To avoid this pain, he will get up and pace his living room for a few minutes before he returns to a reclined or lying down position. On average, he is capable of walking 100 feet before he has to rest, which allow him to check the mail across the street, but not much else. You noted that he relies on a knee brace when leaving the house for an appointment, frequently placing an ice pack on his knee while doing so. On average, he experiences 4-5 bad days per week, daily headaches which at times process to migraines, which recently caused inability to see out of his left eye for the day. Due to his discouragement over his dependency on others, he is frequently plagued with anxious thoughts and bouts of depression.

The additional information reflected:

- Mr. Cummins was seen on August 15, 2019 by Robb N Larsen, MD (orthopedics) for repeat evaluation of his right knee. It was noted that workers' compensation was stating he could do a sedentary position. On examination he was morbidly obese, with antalgic gait, mild effusion of the right knee, range of motion 5-120 degrees, subtle pseudo-laxity to valgus stress, tenderness of the medial joint line, and pain without crepitation. X-rays revealed progressive medial joint space narrowing. He had no interest in surgery or additional injections. Dr. Larsen noted he had little else to offer at this point. The importance of weight loss through low impact activity was again discussed. He recommended a recumbent bike or aquatic therapy. Mr. Cummins asked about a treadmill which he had at home. Dr. Larsen noted this may be better than walking on concrete or other hard surface, but not as beneficial as the bike or swimming. Dr. Larsen also noted, "I do believe he should be able to do a sedentary position. I recommended that he follow through with the PCE…he is not a surgical candidate even if he wanted surgery….morbidly obese and his weight has been climbing."

- X-ray of right knee, August 15, 2019 – mild degenerative changes in the medial femorotibial joint and patellofemoral joint space compartments, subchondral sclerosis and small osteophytes and joint space narrowing medially. Degenerative changes and mildly progressed when compared to the previous study.

- August 30, 2019 letter, Robb N Larsen, MD: writing to provide a brief clarification concerning my orthopedic evaluation of patient…on August 15, 2019….As to whether Mr. Cummins could work in a part time or full time capacity, however, I offer no definitive opinon. Likewise, my opinion should not be interpreted as contrary to the opinion of Mr. Cummins' primary care physician, Dr. David Knowlton, who also believes Mr. Cummins can work in a sedentary position – albeit, for no more than 2 hours per day…..I continue to recommend that a PCE be conducted.

- Therapy note from Christopher Scott, September 10, 2019. Mr. Cummins described disturbance of sleep and self esteem related to physical limitations and insufficient social welfare support, continued grief regarding the historical death of his mother, and discuss regarding conflict with his brother. He was noted to not be a risk to himself or others, with no significant change in mood, affect, thought process/orientation, behavior/functioning, medication or life events. No mental status findings were noted. He was to follow up in two weeks. No further records were received from Mr. Scott.

- Declaration of Michael Cummins – continue to have pain and swelling in right knee aggravated by standing, walking and prolonged sitting, however if remain in one position too long, knee becomes stiff. In early 2018, I suffered a near fatal pulmonary embolism and have since relied on blood thinners to curb the presence of the deep vein thrombosis in my left leg. I experience headaches occurring daily, with frequent migraines. Have to be within close proximity of a restroom, as I have chronic diarrhea, which my physicians believe is due to the medications I have been prescribed. I have gainted nearly 40 lbs since being out of work, no longer possess the capacity to be active, let alone exercise. Spend majority of time in my recliner or on the couch. Medications include 20 mg omeprazole daily, 2 mg loperamide daily, 6 mg warfarin daily, 40 mg Humira weekly, 25 mg hydrochlorothiazide daily, and 40 mg lisinopril daily. Ex-wife and son take care of all household responsibilities. In my current condition, there is simply no way I would be able to perform the material duties of any occupation with reasonable continuity.

- Declaration of Charmaine Bishop – ex-wife of Mr. Cummins. After his injury he was unable to perform activities and my son and I have had to take over many tasks. Michael spends a lot of time in a reclined position, keeping his knee elevated and straight. Complains of headaches on a daily basis. Experiences migraines a few days a week, spending the majority of his time in his room due to sensitivity to light. Only leaves the house when he has to, frequently experiences diarrhea from the medications and often needs immediate access to a bathroom.

- August 26, 2019 letter, David Knowlton, MD (primary care): Mr. Cummins' severe osteoarthritis of his right knee, resulting in pain and frequent edema, and more recent development of chronic migraines, create the following restrictions and limitations: he is unable to sit for more than 15 minutes at a time and no more than 2 hours in an 8 hour day, stand more than 15 minutes at a time and no more than 2 hours in an 8 hour day, walk more

than 15 minutes at a time and no more than 2 hours in an 8 hour day, lift more than 20 pounds, which are disabling to the degree he is unable to perform the material duties of a full time sedentary occupation. Mr. Cummins' medications of Humira, Warfarin, and Omeprazole, among others, cause him to experience the following well known side effects: nausea, dizziness, headaches, and weakness; which would prevent him from performing the duties of a sedentary occupation with reasonable continuity.

- Office visit notes, D Knowlton, MD – July 10, 2019: labs, referral to determatology re: Hidradenitis. BMI: diet and exercise. Other chronic pulmonary embolism: continue coumadin. Nephrolithiasis: referral to Oregon urology institute. May 30, 2019: chief complaints: Protime ; on chronic coumadin, no respiratory symptoms, continues to smoke. INR is stable. Plan: lab, diet and exercise, UTD with colonoscopy. April 18, 2019: protime. Plan: labs, diet and exercise; March 7, 2019: 6 week follow up. Has hidradenitis suppurativa and has been on Humira for 6 months and feels his anxiety and depression has worsened along with generalized osteoarthritis and GI distress with chronic diarrhea and migraine headaches…Continue warfarin, right knee injected with 1 cc Kenalog and 2 cc 2% lidocaine…essential hypertension: continue hydrochlorothiazide; migraines: continue propranolol 40 mg 2 times a day; anxiety – doing well off of benzodiazepines presently. Hidradenitis: Continue Humira kit…morbid obesity: diet and exercise; .DVT: coumadin as above…January 24, 2019: long term disability paperwork and protime: plan long term use of anticoagulants: prothrombin time PT INR, INR, prothrombin time; benign essential hypertension: well controlled now; DVT: INR good today; hidradenitis: continue humira kit; Primary OA of right knee: disability forms filled out; follow up six weeks. December 19, 2018, November 14, 2018, October 3, 2018; lab results various dates.
- May 16, 2019 CT Abdomen Pelvis: 3 mm in proximal left ureter with mild hydronephrosis. Calcifications of both adrenal glands…unchanged from 2015.
- May 16, 2019 & June 5, 2019 Emergency Department Encounter – left flank pain. Discharged with pain medication.
- June 14, 2019 Operative report: cystoscopy stent removal – successful without complication
- June 8, 2019 procedure note, B Walker, MD (urology): Left ureteroscopy lithotripsy with basketing and stent
- July 4, 2019 Discharge Summary – S Barry – R flank pain, acute kidney injury superimposed on chronic kidney disease – passed the stone here….AKI in the setting of acute right renal stone with mild hydronephrosis and medication effects. Resolved on discharge.
- May 17, 2019 EKG – sinus bradycardia.
- Office visit notes D Knowlton/C McAllister PA, October 31, 2017 – January 18, 2019 (hidradenitis suppurativa improving. Continue Humira. Encouraged weight loss and smoking cessation.)
- August 19, 2019 office note, C Scott – seeking treatment for anxiety, depression. Danger to self: none reported. Appearance, motor: unremarkable; cooperative, anxious, congruent with mood, thought process unremarkable; alert, memory: no impairments. Concentration/attention: unimpaired. Cognitive functioning: average. Speech: unremarkable; judgement: fair. Diagnoses: generalized anxiety disorder, dysthymic disorder.

**<u>Appeal Evaluation</u>**

In an Activities Questionnaire completed by Mr. Cummins on January 25, 2019 through your office, he stated the osteoarthritis and complex tear of the medial meniscus in his right knee with severe and constant pain in the knee, right leg and back prevents him from performing any occupation. He stated he gets popping in his knee when going from a sitting to standing position or vice versa, and stiffness if in one position for too long. He noted his ex-wife and step son do the grocery shopping, carrying groceries into the house, cook meals, and clean after meals. He was able to do laundry, manage finances, bathe, style his hair and dress. His son cleaned bathrooms and vacuums. He cannot go up and down stairs. He acknowledged ability to sit for 4 hours per day, stand for 2 hours and walk 15 to 30 minutes per day.

During the claim evaluation of ongoing benefits, Mr. Cummins' claim was reviewed by Deborah Baldemoor, an independent physician who is board certified in Family Medicine. Based on *his/her* review of the medical records, Dr. Baldemoor concluded:

*The medical records suggest that the claimant was released by his occupational medicine provider to return to work unrestricted in April 2017. However, the prior records suggest that he did not have sustained capacity for constant standing, walking, bending and stooping at the knees and walking up and down stairs. The subsequent records from the FCE suggest that he continued to have difficulties in these activities as of August 2017 even though the orthopedic records in October 2017 were limited in scope. The additional records indicate impairment and surgical recovery in November 2017 and again in January 2018 prior to the life threatening pulmonary embolism and DVT that occurred in February 2018. It is likely that the claimant's physical capacity has not improved since 2017 but has actually declined with the presence of the DVT, pulmonary embolism and unchanged morbid obesity. However, there is no evidence of impairment for sedentary to light physical activities at this time.*

And

*Currently, there is no impairment for sedentary activities but it is reasonable that the claimant remains limited in walking and climbing stairs due to his knee arthritis and history of meniscal tear.*

Regarding medication side effects on cognitive capacities, Dr. Baldemoor stated:

*There is no evidence of cognitive impairment. The claimant is noted to have generalized anxiety but there is no evidence of any mental/nervous impairment or significant side effects to medications.*

Regarding Dr. Knowlton's imposed restrictions/limitations, Dr. Baldemoor stated:

*Dr. Knowlton's reply via the attorney indicates that he is in agreement with the FCE for certain activity restrictions that would limit a return to prior work activities. He also mentions restriction from constant sitting for a full-day. I do not see any reason that the claimant is impaired for constant sitting due to his hypertension, osteoarthritis of his knee post prior meniscal tear and generalized anxiety disorder. The pulmonary embolism may impact normal activities including sedentary activities initially from the diagnosis to 4-6 weeks but there is no evidence of any impairment at this time due to the DVT or pulmonary embolism.*
*The FCE suggests that the claimant is deconditioned. However, deconditioning is not clearly noted*

*in the available records. The claimant has been morbidly obese for many years and reports limited activities including limited activities at home, this self-report, if valid, indicates that the claimant self restricts his activities.*

And regarding the PCE/FCE conducted in August 2017, Dr. Baldemoor stated:

*The results of the August 17 physical capacity evaluation are somewhat incomplete. The record mentions 'refused' for some of the activities, specifically climbing ladder and stairs. The overall conclusion of the FCE appears to suggest ability for heavy lifting but limitations on kneeling, bending, stooping, especially of the right knee. Based on the records, I do not see sustained medium level activities due to the overall findings. However, I am not convinced that the claimant has a gait disorder as the orthopedic records from October 2017 do not strongly indicate any gait or balance disorder. The reply letter from John R. Lowry is also not dated and the date of the FCE as noted on the letter is incorrect. The inconsistencies are present but are believed to be related to typos. The claimant did not display full effort throughout the testing as he 'refused' some parts of the exam.*

Dr. Baldemoor called Dr. Knowlton and Dr. Larsen. On July 30, 2018 Dr. Larsen's office reported Mr. Cummins had only one office visit and no activity restrictions were noted in the chart. He was referred to prn office visits (as needed). No further treatment was scheduled at the time.

On July 30, 2018 Dr. Davidson (Cascade Health Occupational Medicine)'s office reported there was no indication of impairment in the last office visit. The physical exam was negative at that time, he was not medically stationary but there was no clear impairment.

On August 6, 2018, Dr. Baldemoor also concluded:

*During the time of April 2017 to the current, the medical records indicate reasonable evidence for limitation of constant standing, walking, bending and stooping at the knees with impaired ability to navigate stairs and ladders on an ongoing basis part-time or full-time through 3 months postpulmonary embolism. However, the medical records including the functional capacity evaluation do indicate reasonable part-time to full-time sedentary capacity from April 2017 onward until the cholecystectomy and reasonable post-operative recovery and then again during the time around the hemorrhoid surgery until 3 month post-pulmonary embolism. It is of note that neither the initial RTW note from occupational medicine in April 2017 nor the FCE in August 2017 indicated any evidence for impairment for sedentary capacity on a full-time or part-time basis. Reasonable recovery from cholecystectomy can be up to a week after surgery to return to normal activities, including sedentary part-time or full-time activities.*

Records received after Dr. Baldemoor's report indicate that on December 19, 2018, Mr. Cummins continued to follow up with Dr. Knowlton for routine monitoring of his INR via lab testing, in treatment of his history of DVT. He was also seen on November 14, 2018 for reported right sided pain that comes and goes in the abdomen for 6-7 years, lasting a few seconds to a minute then going away. It had happened once in the last 6 months. Appetite was noted as normal with no change in bowels and no fevers. It was noted he has migraine headaches and "his beat (beta) blocker therapy seems to be working at preventing them nicely." He had chronic hidradenitis and recently was prescribed T cell modifying therapy from a dermatologist and had not noticed any results yet. On exam of the abdomen, bowel results were normal with no tenderness, masses or organomegaly

detected. Neurological exam was nonfocal. Plan noted Generalized abdominal pain: no worrisome findings today. Migraine headache: continue propranolol tablet 40 mg, 2 times a day. Notes: doing well. Other acute pulmonary embolism without acute cor pulmonale: continue warfarin tablet 6 mg, once a day; notes: doing well. Hidradenitis: continue Humira kit, 40 mg/0.8 ml, subcutaneously, every week. Notes: per dermatology. Morbid (severe) obesity due to excess calories: Notes: diet and exercise. On October 3, 2018 he was seen for protime/labs for his Coumadin treatment. It was noted "today he has no complaints. No fever, vomiting, appetite is good." On September 29, 2018 he was seen for a flu shot. On September 5, 2018 he was seen for protime/labs, noted that symptoms of gastro for two days were getting better now, and he requested a steroid shot in the right knee. Examination revealed bony hypertrophy of the knees. He received an injection of 2cc lidocaine and 1 cc Kenalog. It was noted gastroenteritis should resolve spontaneously. His INR was 2.7 and he was noted to be doing well with regard to DVT.

During the review of your appeal, Mr. Cummins' claim was reviewed by Mary Ellen Dirlam, MD, an independent physician who is board certified in Internal Medicine. The purpose of Dr. Dirlam's review was to consider the non-musculoskeletal diagnoses and identify the supported restrictions/limitations based on these diagnoses as of the April 8, 2019 claim closed.

Based on her review of the medical records, Dr. Dirlam concluded:

*The claimant is a 49 year old with male with multiple non-musculoskeletal conditions, some of which are chronic. These include symptoms related to side effects from pharmacologic therapy, chronic headaches, ureterolithiasis, hypertension, Hidradenitis suppurativa (HS), chronic anticoagulation for DVT/PE prevention, and anxiety/depression. Although the he has been prescribed loperamide, there is little information regarding abnormal bowel function. Both HS and hypertension appear to be under control with current medication.*

*Ureterolithiasis: The acute condition of ureterolithiasis occurred in the spring/summer of 2019. Stone analysis revealed the composition to be 80% uric acid with 20% calcium oxalate (6/2019) and calcium oxalate (65%) with calcium apatite (35%) (7/2019). Literature supports that with medical treatment remission of the condition in more than 75 percent of individuals. He been prescribed hydrochlorothiazide which can aid in the prevention of calcium stones as well as treatment of his hypertension. There is no indication in the currently available medical records of recurrence. This condition would have been impairing secondary to pain during the acute episodes however should not be permanently impairing.*

*Medication side effects: On his letter of 8/26/19, Dr. Knowlton describes nausea, dizziness, headaches, and weakness as side effects of the medications of Warfarin, Humira, and omeprazole, among others, as etiology for impairment. There is limited documentation concerning the severity of symptoms, the impact on daily activities, or the diagnostic workup for these symptoms. If the symptoms are related to medication side effects, the expectation would be supportive records documenting adjustment of medication regimen including trials of alternative medications or even medication discontinuation (depending on the medications) to evaluate for improvement of symptoms since all medications may have side effects. The absence of such alterations in therapy suggests that the symptoms mentioned are not significantly impairing.*

*Headaches: The claimant has had longstanding history of headaches. He is currently taking*

*propranolol for prophylaxis. He has had improvement in his headaches with the use of propranolol (7/10/19) and with treatment for his anxiety (Knowlton, 10/21/15). There is no indication on the 7/10/19 medication list (latest clinical record available for review) that he has been prescribed an abortive medication (medication to use when headache occurs) such as a triptan. It appears that he may be using Ibuprofen as an abortive medication (8/19/19, Scott). For significantly impairing headaches, the expectation would be an escalation of treatment such as neurology specialty referral or medication regimen adjustment.*

*Pulmonary embolism/deep venous thrombosis treated with chronic anticoagulation: The currently available medical records do not document peripheral edema, decreased peripheral pulses, increased bleeding or any respiratory complaints (except for dyspnea on exertion which has been documented since at least 5/2012). The expectation would be for further evaluation of significant respiratory complaints with pulmonary specialist referral, pulmonary function testing or 6 minute walk test. The absence of supporting documentation suggests that these conditions are stable and not significantly impairing.*

*Abnormal bowel function: The claimant's medication list documents loperamide which can be used for loose stools. This medication appears on the list as far back as 11/14/18. There are no clinical records from 11/14/18 to 7/10/19 (latest clinical record) describing the condition, its severity, its impact on activities or its clinical evaluation. The absence of this type of documentation suggests that the condition is not significantly impairing.*

*Behavioral Health: The claimant has had behavioral health diagnoses of anxiety (at least from 9/18/13 forward) and moderate major depressive disorder (MDD) by PHQ-9 on 8/31/17 & 1/24/19 (Knowlton). He has been intermittently treated for anxiety since 2013 however there has been no specific mention of treatment such as ongoing pharmacologic or mental health counselling for the depressive disorder until recently. Although he had a trial of trazadone, it appears to have been discontinued related to side effects. He has had recent evaluation for generalized anxiety disorder and major depressive disorder by Christopher Scott, QMHP (8/19/19) with recommendations for ongoing therapy. The claimant's behavioral health conditions may be impacting his overall clinical condition but do not appear to be impairing. If these conditions appear impairing, recommend obtaining additional clinical records from Christopher Scott or other behavioral health provider and referring to behavioral health specialist consulting physician.*

*It is reasonable to conclude that chronic non-musculoskeletal physical medical conditions and associated therapeutic treatment regimens are not significantly impairing since the currently available medical records lack supporting documentation for further evaluation of these conditions, need for escalation of treatment, or adjustment of medication regimen including trials of alternative medications. There is no supporting documentation in the currently available records for review to suggest any one condition or combination of conditions as currently described in the clinical records would be of significant impact to impair capacity to perform at least sedentary work activities.*

We also referred Mr. Cummins for an Independent Medical Examination with a board certified Physical Medicine and Rehabilitation physician, Victor K. Lin, MD. This examination occurred on November 12, 2019. Dr. Lin concluded:

***PHYSICAL EXAMINATION*** *Manual muscle testing in the bilateral upper extremities is notable for 5/5 strength in bilateral deltoids, biceps, triceps and left wrist flexion, wrist extension and ulnar intrinsics. He has give-way weakness in the right ulnar intrinsics, right wrist flexion and right wrist extension.*

*He has 5/5 strength in bilateral dorsiflexion and plantarflexion. His knee extension and knee flexion is at least 4/5, but there is lack of effort here. His hip flexion and extension is also at least 4/5, but there is lack of effort and some give-way components.*

*Deep tendon reflexes are 2/4 in bilateral upper extremities and 1/5 in bilateral lower extremities. He has normal tone and normal clonus.*

*Seated and straight leg raise are inconsistent. He has positive pain in supine straight leg raise at about 35-40 degrees, but he tolerates closer to 60 degrees while seated.*

*Using single goniometric technique, cervical flexion is measured as 30 degrees, extension 40 degrees, right side bending 18 degrees, and left side bending 24 degrees.*

*Shoulder range of motion flexion is 170 degrees on the right and 165 degrees on the left, extension is 37 degrees right and 37 degrees left, abduction 164 degrees right and 167 degrees left, adduction 15 degrees right and 18 degrees left, internal rotation 85 degrees right and 67 degrees left, and external rotation 87 degrees right and 87 degrees left. There is substantial grimacing and exaggerated sense of fatigue and pain with abduction and flexion movements. Knee range of motion left is 0-105 degrees and right is 3-85 degrees. Some of the restrictions might be brace that he is wearing, and/or self-limited on the right.*

*Right elbow flexion negative 3-133 degrees and on the left is 0-137. There is a little bit of hyperextension in the right elbow compared to the left.*

*Lumbar spine range of motion flexion 73 degrees, extension 23 degrees, right side bending 10 and left side bending 15, right is 45 and left is 35. Again, he is able to get to 60 degrees on both sides in seated straight leg raise exam.*
*Squat is limited to about one-third of the way down he cites pain as limiting factor. Bending over, he has great range of motion and does not describe a lot of pain. He does have an antalgic gait limping on the right and favoring the right knee/leg.*

***ASSESSMENT****: He does have these interesting lesions that are about dime to quarter size. There is sense of fullness and also kind of squiggly like veins that are like an AVM of some sort. In the inguinal area, he shows me there are some that appear to have broken down and might be draining fluid, although the degree of volume is difficult to confirm. The claimant claims it is quite profound. There did not appear to be significant fluid on his underwear, during the exam, and I examined this area at about one hour into his appointment.*

***IMPRESSION:***

*1. Right knee medial meniscal tear, status post excision, with superimposed degenerative arthritis.*
*2. History of left lower extremity DVT and pulmonary embolus, on anticoagulation.*
*3. Right cholecystectomy for right upper quadrant pain.*

*4. Obesity.*
*5. Chronic low back pain of unclear etiology.*
*6. Reported history of head trauma with loss of consciousness and persistent migraines and predominantly lumbar pain, although there is occasional neck and mid back pain as well.*
*7. Chronic migraine headaches possibly related to the head trauma.*
*8. Hidradenitis suppurativa, on Humira.*
*9. Reported history of right ankle ligament tears.*
*10. Right broken toe digit 1 on the foot.*
*11. Right elbow hyperextension injury per report.*
*12. Hypertension.*
*13. History of hemorrhoids status post operative repair.*
*14. Remote history of left wrist and forearm fractures and right wrist fracture.*
*15. Kidney stone, status post stenting procedures.*
*16. Reported history of depression/anxiety/stress disorder.*

Regarding supported restrictions/limitations, Dr. Lin concluded:

*The right knee is partially disabling. I think it is reasonable with other assessments to place this claimant in the sedentary physical demand category with respect of any. He should be restricted to a desk type level job and allowed to sit, stand, and move around as necessary for pain. However, I do not foresee that this should limit him to less than an eight-hour fulltime position. Rationale for this is that the objective evidence with the MRI findings, intraoperative findings supported fairly mild orthopedic injury that most people recover from completely. The degree of arthritis is likewise considered mild to moderate at worst, and should not be markedly disabling. The claimant does have evidence of something of an exaggeration on his presentation on physical exam. Despite the claimant's claims of swelling, etc, none was in evidence on physical exam today, and the medical record does not support its prevalence on presentation.*

*2. His bilateral thumb complaints are not reported in the medical record. On physical exam today, there is no swelling, no provocation of pain with axial compression. Finkelstein's test is negative bilaterally and palpitation is notable only for some very mild pain over the right MCP joint. Therefore, no limitations can be attributed to this condition.*

*3. Left lower extremity DVT/PE. The claimant himself supports that he is not limited from complications of the pulmonary embolus, but is slightly limited from the complications of left lower extremity DVT. However, most outcomes from venous DVT are full recovery even though he needs to remain on Coumadin for life. Even taking the claimant's complaints at face and full value, this is not a completely disabling condition that should add anything to the level of disability already attributed to the right knee.*

*4. Right upper quadrant cramping/spasms. Again, this is based on subjective report only. There are no corroborating reports of continued pain of this nature in the medical record.*

*5. The claimant reports that he is in counseling for depression, anxiety and stress disorder. There are no records to support this.*

*6. Obesity. This would limit his ability to perform any sustained physical tasks. The claimant is*

*quite deconditioned. At a sedentary level of work, the claimant should still be able to perform fulltime work, but would have difficulties with prolonged or sustained walking even on smooth level surfaces. His degree of deconditioning would likely improve with regular exercise, and weight loss.*

*7. Lumbar pain. This is briefly referred to in the chart sporadically, it did not appear to be formally worked up. Therefore, it is difficult to attribute disability. The claimant does seem to have had sporadic reports of back pain in the medical record, and reports that he is simply not someone to complain about such things, which overall may be somewhat accurate. The claimant however given his report of 4/10 pain, etc would appear to be accommodated for in the restrictions already placed on the right knee.*

*8. Head trauma. The claimant did not endorse any cognitive dysfunction. He does report constant ongoing migraines. He reports that these are still two times per week greater than a 10/10 in pain, somewhat controlled by ibuprofen. However, in the medical record, there is clear report from Dr. Knowlton that the claimant received good improvement with alprazolam and then later beta-blockade medications. As the years went by, the headaches overall seemed to become less and less of a factor. The claimant at the very least reported initial improvement with the medication interventions, some worsening with stress and anxiety, but never enough to warrant ongoing further changes in medication management. Therefore, it is also difficult to ascribe any disability with respect to the migraines because there is no significant corroborating records in the medical record, and on physical exam, there is no way to verify the presence or not of headaches.*

*9. The hidradenitis suppurativa is evaluated. I do not doubt that they might be painful, nor do I doubt that some of them are draining. Whether it is a voluminous problem as the claimant indicates is unclear. However, it does appear that this condition would limit this claimant somewhat in terms of acquiring potentially more than usual amounts of time for personal hygiene to maintain areas where the lesions are currently draining.*

*10. Right ankle ligament tears. There are no medical records of this condition. The claimant reports some disability from these still, including some increased numbness in the leg and increased swelling in the leg since the knee injury, but clearly this injury was such that he was able to continue working in his capacity as a Machinist and Machine Operator despite this prior to the knee injury.*

*11. The same is true of his right great toe injury.*

*12. Right elbow extension injury. The same is also true of his right elbow extension injury, which also occurred prior to the knee injury.*

*13. The claimant has reported most recently in August of 2019 as he attempts to attain disability status from his long-term disability carrier that the medications are causing side effects that are further hampering his ability to perform meaningful work. Dr. Knowlton, the claimant's primary care provider, has alluded to the potential for side effects as early as June of 2018, but never documented in medical records that the claimant had ever complained of said side effects. Dr. Knowlton further endorses this potential for side effects again in August of 2019, and it is only around this time that the claimant himself begins endorsing that he has side effects from his*

*medications.*

*14. Remote history of various fractures in his arms and forearms as a child and obviously did not impact his ability to perform meaningful work. Similarly, the various kidney stones although they do cause him occasional pain are also typically not something that should impact the ability to perform meaningful work.*

And

*From a strict diagnosis by diagnosis standpoint, this examiner feels that this claimant would be able to perform sedentary physical demand level work, with extra breaks for personal hygiene due to draining lesions from his hidradenitis suppurativa. This claimant's level of disability has been so longstanding, however, this examiner foresees further difficulties about any attempts at returning to work that are more motivation based.*

Regarding the restrictions/limitations indicated by Dr. Knowlton, Dr. Lin stated:

*The main point of contention is the number of hours that Dr. Knowlton claims that the claimant is limited to compared with other examiners including this examiner. Other examiners project that the claimant could perform sedentary physical demand level work for fulltime, most notably his orthopedic surgeon, and even projections from his physical capacities evaluation. Dr. Knowlton cites what are in effect quotes from the claimant stating that he is unable to perform certain tasks for more than X amount of time or Y amount of time. It is noted in the medical record that various activity forms submitted by the claimant to the insurance carrier that the amount of time that the claimant claimed he could do these tasks diminished as his application proceeded forward. This could be due to the claimant's ongoing further medical complications such as the DVT/PE, progressive deconditioning, etc, but in particular conditions like the DVT/PE should see meaningful recovery, whereas in this patient if this were the case this claimant has not. There has been a clear decline in what the claimant claims he is able to do as time has proceeded on, and Dr. Knowlton's letter seems to reflect report of the claimant's activities. Dr. Knowlton also reports the claimant has potential for side effects from the various medications that he is taking, and states that this might also be a further limiting factor on the claimant's ability to perform work. However, none of Dr. Knowlton's notes that I reviewed specifically cites any medication side effects, and in fact particularly for a medication for migraine for example the medications often seem to have a very beneficial effect that the claimant endorses quite strongly. The restrictions and limitations provided by Dr. Knowlton strike this examiner as more of a lifelong family physician trying to support his lifelong patient, and consequently deemphasizing the limitations as recommended by other providers such as the orthopedic surgeon, and the physical capacities examination evaluator.*

With regard to medication side effects on cognitive of physical capacities, Dr. Lin stated:

*With the exception of the Humira, for which there are not a lot of notes currently as this is still an ongoing issue, the claimant did not report any significant side effects for any of the medications that he was on for various medical conditions over time. In fact, most notably the medications often did what they were supposed to do controlling his blood pressure, reducing his headaches, and better managing his pain. Furthermore on history today, the claimant was quite lucid. Although not a sophisticated historian and with a disappointing lack of detailed recollection regarding which specific medications he takes on a regular basis he was very specific about*

*medications he took on an as needed basis, he was unable to recall which medications may have contributed to what side effects when and where. The medical records clearly suggest that he tried, started and stopped medications at various times and should have been able to identify which medications did what side effects. In fact there is a listing of the claimant's medical allergies and their reactions in Dr. Knowlton's notes and they do not include the medications that the claimant is currently on. The claimant himself did not appear to be cognitively impaired otherwise during the history today in fact he was quite verbose and quite specific and able to answer my questions regarding the various specific medical conditions that he thought were impairing him as outlined in my history, there were good 15 different elements that we reviewed in detail and this is all from his recollection. He did not appear to be lethargic. He did not appear to be ill, he did have a number of antalgic pain behaviors most notably associated with his physical movements. Therefore, this examiner does not feel that claimant is impaired cognitively or physically by side effects from his medications.*

We requested clarification of the frequency of breaks as well as reasonable amount of time needed for each break to address Mr. Cummins' hidradenitis supperativa. Dr. Lin stated two breaks would be needed, one before and one after lunch, and a reasonable amount of time for each break would be 15 minutes. As these breaks are consistent with employment practices, they would not require further restrictions/limitations or accommodations.

Mr. Cummins' claim was previously reviewed by a vocational consultant, for a transferrable skills analysis based on his prior work history, educational background, and/or life experience and capacity within the restrictions and limitations outlined by Dr. Baldemoor. The analysis showed the following:

***Skills & Abilities:***
***Information Management Skills***
- *Ability to check information against appropriate standards.*
- *Ability to maintain paperwork.*

***Technical/Manual Skills***
- *Conduct tests and inspection of products.*
- *Ability to operate equipment and machinery.*
- *Ability to provide preventative maintenance.*
- *Ability to keep a clean and safe work environment.*
- *Ability to stack, turn, and place items.*

***Communication Skills***
- *Follow written and verbal instructions.*
- *Convey Information effectively.*

**Examples of Occupations identified based on (National) labor market and claimants ability profile analysis:**

| DOT Code | Occupation | SVP | Str | National Monthly Median Wage |
|---|---|---|---|---|
| 221.382-022 | Repair Order Clerk | 3 | S | $3,889 |
| 239.367-014 | Dispatcher, Maintenance Service | 3 | S | $3,232 |
| 713.687-018 | Final Assembler | 2 | S | $2407 |

**Wage Information is based on median 2017 Bureau of Labor Statistical Data*
*S = Sedentary*

During the appeal review, Mr. Cummins' claim file was reviewed again by a vocational consultant for an updated transferable skills analysis. The analysis concluded:

*Upon review of the available information, including the above noted updated medical records, this VCM has found that the previously identified occupations outlined within the most recent 02/19/19 TSA report (i.e. Repair Order Clerk; Dispatcher, Maintenance Service; and Final Assembler) remain viable occupational alternatives. The updated restrictions provided by Dr. Lin include the following: "he is restricted to a sedentary PDL full-time job with allowance for more frequent breaks to sit/stand as needed and perform personal hygiene (frequently)." Given that the previously identified occupations fall within these updated restrictions, they, therefore, remain viable alternatives.*

On December 12, 2019, we sent you a copy of the medical and vocational reports contained in the claim file and provided you until January 2, 2020 to submit any additional information you wished for consideration with the appeal. On January 2, 2020 we received your letter with concerns about the IME. You stated neither the IME nor the updated vocational report provide noteable support for the denial, that the IME acknowledges Mr. Cummins' disabling limitations due to multiple, ongoing and fully documented medical conditions, and that the Vocational report provides further support that Mr. Cummins' full disability under the Any Occupation definition of the policy.

We disagree with your position and believe the IME appropriately considered all of Mr. Cummins' conditions and determined his supported restrictions/limitations. During the appeal, we also conducted a review of the file by an internal medicine specialist, Dr. Dirlam, as previously noted. All conditions were considered in our review. We maintain that the claim file reflects the primary condition affecting Mr. Cummins' over the course of the claim was his right knee with some contribution regarding his obesity. It is also true that he suffered DVT/pulmonary embolism during the course of his claim which was/is treated with Coumadin, with no side effects from this noted in the office treatment notes. The records note he suffers from periodic headaches however Dr. Knowlton stated on November 14, 2018 and July 10, 2019 these were well treated with beta blockers. Mr. Cummins has not been referred to neurology nor treated with abortive migraine medications as would have been expected if headaches were impairing. Dr. Knowlton's records note brief symptoms of gastrointestinal issues on November 14, 2018, however there were no clinical records after this date describing this condition, its severity, impact on activities or a clinical evaluation. We acknowledge treatment for episodic kidney stones after the claim closure, which resolved and were not continually impairing from the closure forward. Depression and anxiety were treated on two occasions in August and September 2019, also after the claim closure. There are no records of treatment for depression/anxiety just prior to or around the closure, nor any providers stating he was disabled due to these conditions around that timeframe.

Two separate vocational reviews were conducted of the file with the conclusion that alternative sedentary occupations were identified as compatible with Mr. Cummins' training, education, experience and physical capacities.

**<u>Conclusion</u>**

We conducted a thorough and independent review of Mr. Cummins' entire claim. In summary, we acknowledge that he may have continued to experience some symptoms associated with his conditions beyond April 7, 2019. However, the information does not contain physical or mental status exam findings, diagnostic test results or other forms of medical documentation supporting his symptoms and impairments remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering him unable to perform the duties of the occupations identified as being with in his functional capacity and vocational skills after that date.

Having carefully considered all of the information submitted in support of Mr. Cummins' claim, our position remains that proof of his continued disability in accordance with the Policy provisions after April 7, 2019 has not been provided. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

In order to continue receiving benefits, you must satisfy the requirements of all Policy provisions that state, in part:

*"**Disability**" or "**Disabled**" means:*

1. *For persons other than pilots, co-pilots, and crewmembers of an aircraft:*

*Applicable to Class 2, 2A, 3, 3A, 4, 4A, 5, 5A, 6, 7:*

*b. i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
*ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"**Material and Substantial Duties**" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.*

*"**Any Occupation**" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.*

*"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*

*Proof must be submitted in a form or format satisfactory to Liberty.*

***Disability Benefit***

*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.*

***Discontinuation of the Long Term Disability Benefit***

*The Monthly Benefit will cease on the earliest of:*
*8. the date the Covered Person is no longer Disabled according to this policy;*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Cummins was entitled to appeal the decision made by Lincoln Financial Group, and to submit any additional information you wished to be considered as part of the appeal. Lincoln Financial Group has conducted a full and fair review of your appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, Mr. Cummins' administrative right to review has been exhausted; no further review will be conducted by Lincoln Financial Group and his claim will remain closed. He may request to receive, free of charge, copies of all documents relevant to his claim. He has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

If the plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law. Your employer's plan has a contractual limitations period of three years which means that a lawsuit must be brought within three years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is February 7, 2023.

This information is provided for purposes of this claim only, as the time proof of claim is required may differ based on claim specifics and applicable policy language.

Nothing in this letter should be construed as a waiver of any Lincoln Financial Group of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln Financial Group are based on the provisions outlined in the Astec Industries, Inc. Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Lincoln Financial Group to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ąągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́įł nínízingo doo bąąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Heather Carignan
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 16292
Secure Fax No.: (603) 334-5853